UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DEBBIE OHMAN,

    Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security

    Defendant.

No. 2:16-cv-2722-JAM-EFB

FINDINGS AND RECOMMENDATIONS

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties' cross-motions for summary judgment are pending. For the reasons discussed below, it is recommended that plaintiff's motion for summary judgment be denied and the Commissioner's motion be granted.

I.    BACKGROUND

Plaintiff filed an application for a period of disability and DIB, alleging that she had been disabled since September 20, 2012. Administrative Record ("AR") 179-180. Her application was denied initially and upon reconsideration. *Id.* at 132-136, 140-145. On December 15, 2014, a hearing was held before administrative law judge ("ALJ") Catherine R. Lazuran. *Id.* at 35-68. Plaintiff was represented by counsel at the hearing, at which she and a vocational expert testified. *Id.*

1

The ALJ issued a decision finding that plaintiff was not disabled under sections 216(i) and 223(d) of the Act.[1] *Id*. at 12-22. The ALJ made the following specific findings:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2016.

2. The claimant has not engaged in substantial gainful activity since September 20, 2012, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairments: systemic lupus erythematosus (Lupus); scleroderma; fibromyalgia; obesity; and a depressive disorder (20 CFR 404.1520(c)).

* * *

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 *et seq*. Supplemental Security Income ("SSI") is paid to disabled persons with low income. 42 U.S.C. §§ 1382 *et seq*. Under both provisions, disability is defined, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits. *See* 20 C.F.R. §§ 423(d)(1)(a), 416.920 & 416.971-76; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. *Yuckert*, 482 U.S. at 146 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. *Id.*

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

* * *

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following modifications. She can lift 20 pounds occasionally and 10 pounds frequently; stand and walk six of eight hours; and sit six of eight hours. She should avoid concentrated exposure to extreme cold and heat, hazards, chemicals, and corrosives. She can perform simple, routine, repetitive tasks and detailed tasks, but not highly complex tasks.

* * *

6. The claimant is unable to perform past relevant work (20 CFR 404.1565)

* * *

7. The claimant was born [in] 1960, and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date. The claimant continues to be in the same age category (20 CFR 404.1563)

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. The vocational expert testified that considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

* * *

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 20, 2012, through the date of this decision (20 CFR 404.1520(g)).

*Id.* at 14-22.

Plaintiff's request for Appeals Council review was denied on September 20, 2016, leaving the ALJ's decision as the final decision of the Commissioner. *Id.* at 1-6.

/////

II.     LEGAL STANDARDS

The Commissioner's decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive. *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

III.    ANALYSIS

Plaintiff argues that the ALJ erred by (1) finding that her migraine headaches, gastrointestinal problems and skin impairment were not severe at step-two; (2) rejecting opinions from her treating and examining physicians absent sufficient reasons; (3) discounting her subjective complaints and third-party statements; (4) failing to properly consider all of her impairments in assessing her RFC, and (5) failing to resolve a conflict between the vocation expert's testimony and the Dictionary of Occupational Titles ("DOT").[2] ECF No. 21-1 at 28-51.

/////

/////

---

[2] The court has reorganized plaintiff's arguments into an order that more appropriately corresponds with the sequential evaluation process.

4

A. The ALJ Did Not Err at Step-Two

Plaintiff first argues that the ALJ improperly assessed her impairments at step-two. ECF No. 12-1 at 31-33. She contends that the ALJ erred by finding that her migraine headaches, gastrointestinal impairments, and skin impairment were not severe. *Id*. at 31-33. She further argues that the error was not harmless because the ALJ failed to include limitations caused by these impairments into plaintiff's residual functional capacity ("RFC").

1. Relevant Legal Standards

"The step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). The purpose is to identify claimants whose medical impairment is so slight that it is unlikely they would be disabled even if age, education, and experience were not taken into account. *Bowen v. Yuckert*, 482 U.S. 137 (1987). At step-two the claimant has the burden of providing medical evidence of signs, symptoms, and laboratory findings that show that his or her impairments are severe and are expected to last for a continuous period of twelve months. *Ukolov v. Barnhart*, 420 F.3d 1002, 1004-05 (9th Cir.2005); *see also* 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). A severe impairment is one that "significantly limits" a claimant's "physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting Social Security Ruling ("SSR") 96-3p).

When the ALJ determines that a claimant has at least one severe impairment, he must consider all impairments, including non-severe impairments, at all subsequent steps of the sequential evaluation. *Smolen*, 80 F.3d at 1290; *see also Burch v. Barnhart*, 400 F.3d 676, 682-82 (9th Cir. 2005) (ALJ's failure to find claimant's obesity severe at step two was harmless error where it was considered in determining claimant's RFC).

a. Migraine Headaches

Plaintiff testified that she would get headaches three to four times a week, with each headache generally lasting half of the day. AR 49. She also reported that every time she gets a

headache she experiences nausea and vomiting, and she needed to lie down and sleep to alleviate her headache. AR 68, 72. She further testified that she was prescribed Tomamax for her headaches, but she stopped taking it because it was "giving [her] side effects." *Id*. at 48. She also stated that she had not taken Motrin in a long time because it did not help with her headaches. *Id*.

The ALJ acknowledged that plaintiff had problems related to migraine headaches, but determined the level of severity described by plaintiff at the hearing could not be reconciled with the descriptions plaintiff provided to her treating doctors. Thus, the ALJ concluded that the headaches were not severe because they had been medically managed. AR 14-15.

A treatment note from October 2011 reflects that plaintiff had a history of intermittent migraines, which had been controlled over the last several years with Excedrin Migraines. AR 454. Her migraines were described as "not severe" and "mild," requiring treatment "with over-the-counter medication once a month." AR 455. An MRI from February 2013 contained findings that were most compatible with either mild chronic small vessel ischemic disease or sequelae of migraines. AR 483. In March 2013, plaintiff was seen for a neurological consultation to address her migraine headaches. AR 546-48. AR 546. At that time she reported having severe headaches 1-2 times a month—which could last for 2-3 days—as well as less severe headaches occurring 1-2 times a week. AR 546. However, she also reported that her headaches were less severe since beginning Topamax the prior month, and that her headaches were aborted "easily" with Motrin. *Id*. at 546.

Treatment records from April 25, 2013, reflect that plaintiff continued to benefit from taking Topamax. She reported that over the prior month she had only had three headaches, which were all relieved with Motrin. AR 530. An MRI performed the same month resulted in normal findings (AR 481), and an ultrasound of the carotid arteries showed no evidence of carotid stenosis (AR 482). The following month, plaintiff complained of left hemicranial pain, which she reported experiencing the prior two months. AR 577. It was again noted that plaintiff had seen improvement in the frequency and severity of her headaches with Topamax and aspirin. AR 577. Her treating physician suspected that plaintiff's headaches were caused by obstructive sleep apnea (AR 578), but sleep apnea was subsequently ruled out (AR 584).

Despite consistently reporting positive results from taking Topamax, at the hearing plaintiff testified that she stopped taking Topamax after 6-12 months because it "was giving [her] side effects and [she] didn't like it." AR 48. Although plaintiff did not specify at the hearing the particular side effect she experienced, medical records reflect that Topamax caused a tingling sensation. *Id*. at 577.

These records support the ALJ's findings that plaintiff's migraine headaches were properly controlled with medication. Plaintiff regularly reported improvement with Topamax and that her headaches were easily resolved with Motrin. *Warre v. Comm'r Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for" disability benefits.). Although plaintiff testified that Motrin did not provide relief, the ALJ properly relied on plaintiff's contrary statements to her healthcare providers to find that her headaches were managed with medication. *See Diedrich v. Berryhill*, 874 F.3d 634, 638 (9th Cir. 2017) ("The ALJ is responsible for studying the record and resolving any conflicts or ambiguities in it."). Accordingly, the ALJ did not err in finding that plaintiff's migraine headaches were not severe.

### b. Gastrointestinal Impairment

Plaintiff also contends that the ALJ erred by failing to find that plaintiff has severe gastrointestinal impairments. ECF No. 12-1 at 32. In her decision, the ALJ noted that plaintiff had problems related to mild diverticulosis, gastroesophageal reflux disease ("GERD"), internal hemorrhoids, and irritable bowel syndrome, but found that the impairments were not severe. AR 14. The ALJ concluded that these conditions (as well as plaintiff's other non-severe impairments) have been managed with medication and did not require aggressive medical treatment. *Id*. at 15.

In February 2011, plaintiff was seen at a medical clinic for complaints of pain with nausea and vomiting. AR 420. Plaintiff, however, denied having diarrhea. *Id*. Two days later, plaintiff underwent a gastroenterological consultation (AR 340-43), at which she reported having "some loose stools a few times." AR 342. A CT scan showed inflammation and thickening of the small bowel wall, with no abscess or perforation. *Id*. Plaintiff was diagnosed with minimal gastritis,

/////

small hiatal hernia, minimal GERD, and gastroenteritis, and was treated with antibiotics. *Id*. at 340.

The antibiotics appeared to resolve plaintiff's gastrointestinal issues, as subsequent treatment notes from August, September, and October 2011 demonstrated mostly complaints of back and hand pain, with no reports of gastrointestinal issues. AR 408-417. However, in November 2011, plaintiff was seen for complaints of severe abdominal pain. AR 338. She reported that her symptoms, which included "some loose stool," had been present for the past 6 days. *Id*. at 338. She was diagnosed with left-sided abdominal pain, suspected to be caused by diverticulitis. AR 339. A colonoscopy in January 2012 confirmed the presence of mild diverticulosis, and plaintiff was advised to start a high-fiber diet. AR 336-37.

Plaintiff was evaluated in April 2012, but no gastrointestinal issues were noted. AR 406-407, 418-419. In December 2012, during an examination with her rheumatologist, plaintiff denied experiencing nausea, diarrhea, constipation or vomiting. *Id*. at 363. Plaintiff's next complaints of abdominal pain were not made until June 2013, at which time she reported to her physician that she had experienced abdominal pain and diarrhea for the majority of her life, with diarrhea occurring frequently after eating. AR 584. However, she also noted that her "abdominal pain attacks" occurred on an annual basis, and would last only for a few days before resolving spontaneously. *Id*. Her physician concluded that plaintiff's symptoms were suggestive of a functional gastrointestinal disorder, including functional dyspepsia as well as irritable bowel syndrome, which were treated with medication. (Dicyclomine and Imiparmine). *Id*.

In June 2014, plaintiff was evaluated by a gastroenterologist for complaints of frequent abdominal discomfort and diarrhea. AR 656-657. Examination of the abdomen was noted to be essentially unremarkable, and plaintiff was advised to take Paxil—which she had recently stopped taking—and to adjust her diet.[3] AR 656-57.

---

[3] Plaintiff contends that her treatment records "repeatedly document that she has suffered from gastrointestinal issues including diverticulosis, IBS, and GERD between April 3, 2012 and October 12, 2014. ECF No. 12-a at 14. The records cited by plaintiff merely indicate that she had previously been diagnosed with those impairments. *See* AR 406, 503, 505, 508, 633, 637, 640, 641, 646, 651, 662, 674, 682. They do not reflect that plaintiff was experiencing gastrointestinal symptoms at the time of examination, nor do they reflect that plaintiff received

8

These records demonstrate that plaintiff's bowel issues required only infrequent medical attention, and were largely treated with medication and a recommendation that plaintiff change her diet. Notably, none of plaintiff's physicians indicated that plaintiff's gastrointestinal issues impaired her ability to work. Moreover, plaintiff's own statements suggest that her bowel issues would not significantly impact her ability to work. Plaintiff testified that her bowel issues usually occur shortly after she eats, but that she only eats one meal a day. AR 44. Thus, the record does not support plaintiff's contention that she would regularly need to take frequent breaks to use the bathroom.

### c. Skin Impairment

Plaintiff also contends that the ALJ should have found that she had skin problems that impair her ability to engage in fine manipulation with her hands. ECF No. 12-1 at 32-33. Contrary to plaintiff's contention, the record does not demonstrate a recurring skin issue impairing plaintiff's ability to work.

Treatment records from August and September 2011 reflect that plaintiff's skin had no rashes or suspicious lesions, but it was noted that she had white, dry, flaky skin on her feet. AR 411, 413, 415, 417. Subsequent treatment notes appear to indicate that plaintiff's skin condition had resolved, as dry or flaky skin was not noted on examination. *Id*. at 418, 426. In June 2012, plaintiff's rheumatologist noted that plaintiff had small pustular lesions on her hands. AR 551. At that appointment, plaintiff reported experiencing similar lesions two years earlier, which cleared with antibiotics. *Id*. Shortly thereafter, plaintiff was diagnosed with dermatitis, which was treated with Prednisone. AR 394. In July 2012, plaintiff was seen by a dermatologist for bumps, blisters, and cracking on her hands and feet. AR 385-386. However, on exam only scaly dermatitis on the hands and feet—which caused only mild itching—was noted. *Id*. Plaintiff dermatitis was treated with an ointment (AR 386), which resolved the issue (AR 381). In December 2012, plaintiff was seen by a rheumatologist for a follow up for her Lupus, at which time plaintiff reported that her pustular lesions had persisted. AR 360. However, the treatment

---

treatment for her gastrointestinal impairments. *Id*.

record also reflects that plaintiff had stopped taking her prescribed medication because she believed it was responsible for her gaining weight. *Id*.

In January 2013, plaintiff was seen by a dermatologist for a rash on her hands and feet. AR 374-376. She was diagnosed with Psoriasis, and it was recommended that she receive UVB treatment and follow up in four weeks. *Id*. at 375. There is no indication that plaintiff followed up with the medical provider. However, the following month plaintiff was seen by a physician's assistant for concerns of peeling skin on plaintiff's hands and feet, which was described as painful. AR 469. Examination showed eczematous dermatitis on the left hand and scaly patches on the ankles were noted. AR 469. Plaintiff was prescribed Prednisone, Kerodex cream, Clobetasol cream, and Methotrexate, and directed to follow up in two weeks. AR 470. In June 2013, plaintiff was seen for complaints of an itchy rash on her hands and feet. *Id*. at 583. A biopsy was performed to rule out dermatitis, and plaintiff was directed to follow up as needed. *Id*.

The record shows that plaintiff's skin condition resulted in blisters, which could have conceivably limited plaintiff's ability to perform work-related activities. But plaintiff only experienced blisters for a short duration and on an infrequent basis, with a two year gap between symptoms of blisters. Thus, plaintiff's blisters were too infrequent to substantial impair her ability to work. *See* 42 U.S.C. § 423(d)(1)(A) (medical impairment must last or be expected to last for a continuous period of 12 months). The remaining records show that plaintiff's skin impairment was generally described as itchy and, as found by the ALJ, was "amenable to proper control by adherence to recommended medical management and medication compliance." AR 15. Accordingly, the ALJ did not err in finding that plaintiff's skin impairment was not severe.

      B.      <u>The ALJ Failed to Provide Legally Sufficient Reasons for Rejecting the Opinion of Plaintiff's Treating Physician</u>

          1.      <u>Relevant Legal Standards</u>

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. *Lester*, 81 F.3d at 834. Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know

and observe the patient as an individual. *Id.*; *Smolen*, 80 F.3d at 1285 (9th Cir. 1996). To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating or examining medical professional may be rejected for "specific and legitimate" reasons that are supported by substantial evidence. *Id.* at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (e.g., supported by different independent clinical findings), the ALJ may resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)). However, "[w]hen an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not 'substantial evidence.'" *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007).

### 2. Background

Plaintiff received treatment from Dr. Firooz Amjadi, a bone and joint specialist, on two separate occasions. On September 19, 2012, plaintiff was evaluated for complaints of left-sided thoracic pain. AR 355. X-rays showed multilevel thoracic degeneration, and an MRI of the thoracic spine showed mild degenerative changes with no significant stenosis. *Id.* Dr. Amjadi diagnosed plaintiff with thoracic pain and mild thoracic degeneration. Dr. Amjadi prescribed plaintiff Flexeril, and also recommended she receive trigger injections, perform home exercises, and use of anti-inflammatory. *Id.* Less than three weeks later, Dr. Amjadi evaluated plaintiff again. At that time plaintiff was diagnosed with low back pain and multilevel lumbar degeneration. Dr. Amjadi recommended plaintiff receive physical therapy, take anti-inflammatories, and begin a weight loss program. AR at 353. He also prescribed Valium to help with plaintiff's muscle spasms. *Id.*

Dr. Amjadi authored a letter stating that plaintiff could no longer work as a data entry clerk due to her physical limitations. AR 254. Dr. Amjadi opined that plaintiff was unable to sit

11

or stand for long periods of time without breaks; could not lift, pull, or push more than two pounds; and could not engage in repetitive arm and hand movements. *Id*.

In addition to Dr. Amjadi's opinion, the record also contains opinions from two non-examining physicians, Dr. G. Bugg and Dr. Mai. Dr. Bugg opined that plaintiff could perform light work, but needed to avoid concentrated exposure to extreme cold and heat, chemicals and corrosives. AR 94-95. Dr. Mai agreed with the limitations assessed by Dr. Bugg, but further opined that plaintiff needed to avoid concentrated exposure hazards such as machinery or heights. AR 111-112.

The ALJ gave little weight to Dr. Amjadi's opinion, finding that it was "extreme in light of the conservative nature of the claimant's medical treatment and her intermittent non-compliance with treatment." AR 19. Although the ALJ's decision does not discuss the opinions of the state agency physicians, it is clear that the ALJ reviewed and adopted their opinions as they essentially mirror plaintiff's RFC.

### 3. Analysis

Because Dr. Amjadi's treating opinion was contradicted by the opinions of the state agency physicians, the ALJ was required to provide specific and legitimate reasons for rejecting his treating opinion. *Lester*, 81 F.3d at 830. The ALJ's first reason for rejecting Dr. Amjadi's opinion was that the opinion was contrary to the conservative nature of plaintiff's treatment. AR 19. An ALJ may reject the opinion of a treating physician who prescribed conservative treatment, yet opines that a claimant suffers disabling conditions. *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001).

In her decision, the ALJ did not specifically identify any evidence in the record that suggesting that plaintiff's impairments were conservatively treated. Dr. Amjadi's own treatment records reflect that in addition to recommending plaintiff take anti-inflammatories, change her diet, and exercise, he also prescribed her Flexeril and Valium and made a referral for trigger point injections. Such treatment is not conservative. *See, e.g., Miller v. Colvin*, 2014 WL 1873276, at *2 (C.D. Cal. May 9, 2014); *Ardito v. Astrue*, 2011 WL 2174891, at *4 (C.D. Cal. June 3, 2011) (finding narcotic prescriptions and muscle relaxers to be anything but conservative treatment);

12

*Ponce v. Astrue*, 2012 WL 253970, at *7 (C.D. Cal. Jan. 26, 2012) (finding that treatment with medication and trigger injections were not conservative); *See also* Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) (finding that conservative treatment, including use of only over-the-counter medication for pain, supported adverse credibility finding).

Moreover, there is nothing in the record to suggest that the treatment plaintiff received from other medical providers was inappropriate or abnormally conservative in light of impairments reported by the doctor.[4] As acknowledged by the ALJ, plaintiff's impairments included fibromyalgia and systemic lupus erythematosus ("lupus") with scleroderma. Fibromyalgia is "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue." *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004). "Common symptoms . . . include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease." *Id*. at 589-90. "Fibromyalgia's cause is unknown, there is no cure, and it is poorly understood within much of the medical community." *Id*. at 590. The treatment options can only be from those that actually exist. Here, the condition is generally treated with medication, as surgery is not an available course of treatment. *See Miller*, 2014 WL 1873276 at *2 ("Plaintiff consistently has been medicated due to her back pain and fibromyalgia, and Plaintiff has followed the recommended course of treatment for fibromyalgia, which does not include surgery."); *Gillett v. Astrue*, 2008 WL 5042848, at *3 (C.D. Cal. Nov. 25, 2008) ("[T]here is no surgical or other cure for fibromyalgia . . . .").

Lupus "is a chronic inflammatory disease that can affect any organ or body system." 20 C.F.R. pt. 404, subpt. P, app. 1 § 14.00.D1. Common symptoms of the disease include severe fatigue, fever, malaise, joint pain, and skin lesions. *Id*; *Merck Manual of Diagnosis and Therapy*, 305-06 (19th ed. 2011). Like fibromyalgia, there is no cure for Lupus. *See Lively v. Colvin*, 2017 WL 65316, at*3 (W.D. Wash. Jan. 6, 2017).

---

[4] A fair reading of the ALJ's decision seems to suggest that the ALJ believed that plaintiff's overall care, not just the treatment provided by Dr. Amjadi, was conservative in nature. *See* AR 18 ("Although the claimant has received treatment for the allegedly disabling impairment(s), that treatment has been essentially conservative in nature.").

13

Plaintiff's longitudinal medical record, as summarized by the ALJ, demonstrates that plaintiff's fibromyalgia and lupus caused ongoing weakness, achiness, fatigue, muscle and joint pain, and stiffness. AR 19. To address these symptoms, plaintiff was prescribed Plaquenil, Depo Mederol injections, Methotrexate, Tramodol, and Lyrica. *See, e.g.*, *id*. at 360-364, 550-552. The ALJ does not explain why such treatment is relatively "conservative in nature," nor did she specify what further treatment that could have been pursued as to fibromyalgia and lupus that would indicate the sort of functional limitations reported by the treading doctor.[5] In the context of assessing a claimant's credibility, the Ninth Circuit noted that a claimant "cannot be discredited for failure to pursue non-conservative treatment options where none exists." *Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010) (noting that the record did not "not reflect that more aggressive treatment options [were] appropriate or available."). The reasoning equally applies here. Accordingly, the ALJ's statement that plaintiff's treatment was conservative in nature says little as to why the ALJ rejected the opinion of Dr. Amjadi, and that determination is not supported by substantial evidence. *See, e.g., Lively*, 2017 WL 65316 at*3 ("The ALJ does not specify what further treatment measures would be expected to treat plaintiff's Lupus, and the characterization of plaintiff's prescription for HCQ as 'conservative' is not a legitimate reason for the failure to credit fully the opinion from plaintiff's treating rheumatologist."); *Sharpe v. Colvin*, 2013 WL 6483069, at *8 (C.D. Cal. Dec. 10, 2013) (finding that treating the plaintiff's fibromyalgia with, *inter alia*, Vicodin and Tramadol was not conservative treatment).

The ALJ's remaining reason for rejecting Dr. Amjadi's opinion is that it was inconsistent with plaintiff's intermittent non-compliance with treatment. AR 19. A plaintiff's failure to follow a physician's prescribed course of treatment is a specific and legitimate reason for rejection the physician's opinion. *See Owen v. Astrue*, 551 F.3d 792, 800 (9th Cir. 2008) ("[A] claimant's noncompliance can constitute evidence that is inconsistent with a treating physician's

---

[5] Notably, plaintiff received little benefit from Plaquenil (AR 550), which "is prescribed for discoid or systemic lupus erythematosus and rheumatoid arthritis in patients whose symptoms have not improved with other treatments." *Rohrbacher v. Colvin*, 2015 WL 1006678, at *5 n.5 (C.D. Cal. Mar. 5, 2015)

14

medical opinion and, therefore, can be considered in determining whether to give that opinion controlling weight."); *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007) ("[I]f a claimant complains about disabling pain but fails to seek treatment, or fails to follow prescribed treatment, for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated"); 20 C.F.R. §§ 404.1530(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled").

In her decision, the ALJ specifically found that there had been periods since the alleged onset date that plaintiff had not been taking any medications for her symptoms. AR at 18. She also notes various occasions when plaintiff was not taking medication. *Id*. at 19. As explained below, all of the records cited by the ALJ either fail to demonstrate a failure to follow a prescribed course of treatment or the instances of noncompliance are completely unrelated to Dr. Amjadi's treatment of plaintiff's back pain.

The ALJ first cites to a May 14, 2013, treatment note. AR 18, 579. But that record actually reflects that plaintiff was taking Lyrica and Topamax as directed by her physician. *Id*. at 578. The ALJ also noted that in September 2012, plaintiff was only taking Ibuprofen as needed. AR 18; 348. That same treatment record, however, reflects that plaintiff was being seen to receive a "left intercostal nerve block at levels T7-9 . . . as per Dr. Amjadi's request." *Id*. Thus, the medical record cited by the ALJ actually demonstrates that plaintiff was following the treatment recommended by Dr. Amjadi.

The ALJ also cites to treatment record from plaintiff's rheumatologist, which reflect that plaintiff stopped taking Methotrexate after one month because it "ran out." *Id*. at 619. However, plaintiff also reported that she did not resume the medication because [s]he had not noticed any benefit from the medication." *Id*. As the ALJ did not question plaintiff's claim that the medication was ineffective, the instance of noncompliance cannot be counted against Dr. Amjadi's opinion. *See Trevizo v. Berryhill*, 871 F.3d 664, 680 (9th Cir. 2017) (finding that because the ALJ did not evaluate or find unbelievable plaintiff's claim that she was noncompliant with medication due to fear it would cause a rash, that instance of noncompliance "cannot be

/////

15

counted against" the plaintiff.). Furthermore, plaintiff's rheumatologist did not appear to question plaintiff's claim as he discontinued Methotrexate and prescribed Lyrica. AR 619.

The ALJ also noted that in December 2012, plaintiff had been off Plaqunil for several months. *Id*. at 360. The treatment record reflects that plaintiff was given a six month trial of Plaquenil, but she stopped taking the medication after 5 months because it was providing little benefit and she believed it was responsible for her gaining weight. *Id*. at 360. Plaintiff's physician did not question plaintiff's representation and discontinued plaintiff's Plaquenil and prescribed other medication. The ALJ also did not question plaintiff's claim, and therefore this instance fails to demonstrate an unexplained failure to follow the prescribed course of treatment. *See Trevizo*, 871 F.3d at 680.

The remaining records cited by the ALJ have no relation to Dr. Amjadi's treatment of plaintiff's back pain. For instance, the ALJ cites to treatment record reflecting that plaintiff failed to receive the prior year's annual Reclast infusion treatment for her osteoporosis. AR 619. While skipping her annual infusion may possibly undermine any contention that plaintiff's osteoporosis imposed severe limitations (a position plaintiff does not advance), it has no relation to Dr. Amjadi's opinion which was based on plaintiff's back pain.[6]

Similarly, the ALJ also cited to records reflecting that plaintiff had failed to have her recommended annual MRI of her brain performed the past couple years (*id*. at 633), and failed to quit smoking as advised by her physician (*id*. at 637). The recommendation that plaintiff obtain an MRI of her brain clearly relates to her complaints of headaches, while the advice to quit smoking appears to just general health advice from her primary care physician. These instances of noncompliance are completely unrelated to Dr. Amjadi's treatment of plaintiff's back pain and fail to provide a basis for questioning his treating opinion. *See Dinwiddie v. Comm'r Soc. Sec.*, 2016 WL 3896559, at *9 (E.D. Cal. July, 18, 2016) ("Courts throughout the Ninth Circuit have

/////

/////

---

[6] The ALJ specifically found that plaintiff's osteoporosis was not severe, a finding plaintiff does not challenge.

16

found that the failure to quit smoking against medical advice *where the alleged disabling condition is aggravated by smoking* undermines the credibility of the claimant's subjective complaints.") (emphasis added).

Based on the foregoing, the only relevant instances of non-compliance involved plaintiff stopping her Methotrexate and Plaquenil based on her contention that the medication were not providing relief. *Id*. at 360, 619. The ALJ did not find that claim unbelievable, and therefore the two instances of noncompliance cannot support the rejection of Dr. Amjadi's opinion.

Accordingly, the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Amjadi's treating opinion.[7]

### C. Remand for Further Proceedings

"A district court may reverse the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing, but the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) (internal quotes and citations omitted). A district court may remand for immediate payment of benefits only where "(1) the ALJ has failed to provide to provide legally sufficient reasons for rejecting evidence; (2) there are no outstanding issues that must be resolved before determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Benecke v. Barnhart*, 379 F.3d 587, 563 (9th Cir. 2004). However, even where all three requirements are satisfied, the court retains "flexibility" in determining the appropriate remedy. *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014). "Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits." *Dominguez*, 808 F.3d at 407. Moreover, a court should remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Garrison v. Colvin*, 759 F.3d 995, 1021 (9th Cir. 2014).

---

[7] As the matter must be remanded for further proceedings on this basis, the court declines to address plaintiff's additional argument.

17

The court cannot find that further administrative proceedings would serve no useful purpose. As indicated above, the record indicates that the ALJ failed to adequately consider the medical opinion evidence in light of plaintiff's impairments of fibromyalgia and lupus. Accordingly, remand for further proceedings is appropriate to allow the ALJ to consider such evidence and make appropriate findings.

IV. CONCLUSION

Accordingly, it is hereby RECOMMENDED that:

1. Plaintiff's motion for summary judgment be granted;

2. The Commissioner's cross-motion for summary judgment be denied;

3. The matter be remanded for further proceedings; and

4. The Clerk be directed to enter judgment in plaintiff's favor.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan,* 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 14, 2018.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE